# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAREEM ARMSTRONG | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 13-1300 |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN E. WETZEL, BRIAN V. COLEMAN, ERIC JOHNSON, JARED ANKROM, RICHARD VOYTKO, LISA DUNCAN, TIMOTHY NELIGH, DEBRA HUSARCHIK | ) ) ) ) ) ) ) | Magistrate Judge Lisa Pupo Lenihan<br><br>ECF No. 49 |
| Defendants. | ) | |

## MEMORANDUM OPINION

**Lenihan, M.J.**

Presently before the Court is the Motion for Summary Judgment filed by Defendants John E. Wetzel ("Wetzel"), Brian V. Coleman ("Coleman"), Eric Johnson ("Johnson"), Jared Ankrom ("Ankrom"), Richard Voytko ("Voytko"), Lisa Duncan ("Duncan"), Timothy Neligh ("Neligh"), and Debra Husarchik ("Husarchik") (collectively "Defendants") (ECF No. 49). Plaintiff brings this civil action against all Defendants pursuant to 42 U.S.C. § 1983. Specifically, Plaintiff alleges a violation of the Eighth Amendment to the United States Constitution for failure to protect while incarcerated at the State Correctional Institution at Fayette ("SCI-Fayette"). Plaintiff asserts that the Defendants at SCI-Fayette failed to protect him from assaults by his cellmate, James Copeland ("Copeland") in October 2012, culminating in an attack by Copeland in the early morning hours of October 31, 2012. Plaintiff's Grievance No. 434778 indicates that Copeland stabbed him, tied him up, choked him with a cord, then placed a hood over his head, poured water over his face, and shouted he was going to kill him. (ECF No. 56-1 at 28.)

Defendants argue that, in addition to having no knowledge that Copeland was a threat to Plaintiff, the record is replete with evidence that Plaintiff and Copeland staged the attack in an attempt to regain single cell ("Z" Code) status. For the reasons discussed below, the Motion for Summary Judgment ([ECF No. 49](ECF No. 49)) will be granted because Plaintiff has failed to come forward with a genuine issue of material fact. That is, based on the evidence of record, no reasonable jury could return a verdict for Plaintiff.

I.  RELEVANT FACTS

The following facts are undisputed unless otherwise indicated and are taken from the parties' Statements of Material Facts and Responses thereto (ECF Nos. 51, 56, & 57) and supporting documentation of record.

A. **Plaintiff Loses his "Z" Code Status**

The Pennsylvania Department of Corrections ("DOC") has established a policy with respect to reception, classification, and housing of inmates. (DOC Policy 11.2.1, [ECF No. 52-3](ECF No. 52-3).) The policy also establishes certain program codes used by the DOC for classification and housing of inmates.

Section 5 of DOC Policy 11.2.1 provides for Single Celling, or "Z" Code, and Double Celling Housing. ([ECF No. 52-3 at 20-23](ECF No. 52-3 at 20-23).) A "Z" Code is assigned to inmates who are required to be housed in a single occupancy cell within any custody level. The policy initially establishes, among other things, "the procedures for requesting consideration for termination of double celling and instructions for inmates to follow to inform staff of any problems arising as a result of double celling." ([ECF No. 52-3 at 20](ECF No. 52-3 at 20).) The policy also sets forth several guidelines for consideration of inmates who require single celling as follows:

1. Any inmate who meets any of the following criteria shall be *carefully reviewed by staff and considered* for Program Code "Z" housing classification.

    a. An inmate who is evaluated by psychiatric or psychological staff as having mental health problems.

    . . .

    e. An inmate with known or documented homosexual behavior.

    . . .

2. When an inmate is transferred from one facility to another, the sending facility shall explain the specific reason for "Z" Code in the transfer rationale. The Initial Reception Committee at the receiving facility shall review the "Z" Code housing classification to determine if it is still appropriate for the inmate. If a change is indicated, the change shall be processed according to the procedures in Subsection C.4., below.

3. When reviewing an inmate for "Z" Code housing status, facility staff shall complete a review of appropriate documentation. Documentation shall include misconduct reports, recommendations from medical and/or psychiatric or psychological staff, and reports from other staff who have knowledge of the inmate's adjustment and behavior. The Program Review Committee, Unit Manager, or Shift Commander may temporarily assign a "Z" code until a full assessment is completed.

4. If there is a recommended change upon completion of the annual review, a DC-46 Vote Sheet along with other relevant information shall be circulated to the Facility Manager/designee who shall make the final decision. The staff action and rationale for "Z" Code housing status shall be documented on the DC-14 . . . .

([ECF No. 52-3 at 21-22](ECF No. 52-3 at 21-22)) (footnotes omitted) (emphasis added).

An "O" Code is assigned to inmates who have or exhibit medical conditions, mental health conditions, or other vulnerability traits which may require an elevated level of observation

by housing unit staff when the inmate is assigned to a general population housing unit. (ECF No. 52-6 at ¶ 4.)

When Plaintiff was transferred from SCI-Dallas to SCI-Fayette in August of 2010, he carried an "O" Code and a "Z" Code. (ECF No. 52-4 at 2.) His "Z" Code designation dated back to 2006 at SCI-Forest, and was to remain only "until Inmate Armstrong was taken off the Mental Health Roster." (ECF No. 52-4 at 2.) Plaintiff has not been on the Mental Health Roster since July 2009. (ECF No. 52-4 at 2.)

In early 2011, Defendant Duncan, a DOC psychologist, was asked to review the current status of Plaintiff's "Z" Code. (ECF No. 52-6 at ¶ 5.) This review consisted of Duncan's examination of Plaintiff's prison file, mental health records, medical records, and an in-person interview with Plaintiff on February 4, 2011. (ECF No. 52-6 at ¶ 5.) Defendant Duncan issued a report which concluded that Plaintiff did not exhibit any psychological criterial to warrant maintaining his "Z" Code, made no recommendation, but referred review of his "Z" Code to security for reasons related to the initial assignment of his "Z" Code. (ECF No. 52-6 at ¶ 6.) At this time, Plaintiff did not express to Duncan that he was concerned for his safety for any reason. (ECF No. 52-6 at ¶ 7.) A Vote Sheet was circulated to Plaintiff's Unit team and other administrators who concluded that Plaintiff did not meet the established criteria for single celling. Therefore, his "Z" Code was removed on March 1, 2011. (ECF No. 52-4 at 2, 44.) Plaintiff filed Grievance No. 363344 requesting that the Vote Sheet be resubmitted and that he be returned to his "Z" Code status. (ECF No. 52-4 at 4.) Plaintiff also stated that if he is harmed in any way, the institution is on notice. (*Id.*) Plaintiff appealed Grievance No. 363344 to second level review. He again stated that the institution is supposed to be protecting him and if he is injured, he questioned who will be responsible. (52-4 at 7-8.) Plaintiff described his strong

desire for sex, and that he enjoys walking around nude. Plaintiff stated that if he is attacked by his cellmate because he masturbates in front of him, then the institution will be responsible because "Z" Code has been taken from him. (52-4 at 7-8.)

Thereafter on April 29, 2011, Plaintiff was issued Misconduct No. 007429 for being nude in another inmate's cell. ([ECF No. 52-4 at 10](#).) He was given 60 days in the Restricted Housing Unit ("RHU") in Disciplinary Custody effective April 29, 2011. ([ECF No. 52-4 at 12](#).) Thereafter, he was cleared to return to general population provided that he agreed to double cell. Plaintiff indicated there would be no problems and agreed to double cell. ([ECF No. 52-4 at 14](#).)

On June 30, 2011, Plaintiff was again considered for "Z" Code. A Vote Sheet reflected that there was no support for "Z" Code status because Plaintiff did not meet the necessary criteria. ([ECF No. 52-4 at 18](#).)

On August 18, 2011, Plaintiff was issued Misconduct No. 593575 for exercising naked in his cell and for refusing several orders to get dressed. He was reported to a corrections officer by his cellmate. ([ECF No. 52-4 at 24](#).) Thereafter, Plaintiff reported that he would cooperate and take a cellmate. ([ECF No. 52-4 at 28](#).)

### B. **Defendants Attempt to Accommodate Plaintiff**

On April 1, 2012, Plaintiff submitted an "Inmate's Request to Staff" form wherein he again described why he needs his "Z" Code status reinstated. ([ECF No. 52-4 at 36-37](#).) Plaintiff indicated that he was attacked in his cell by a cellmate in 2004, and this event left him traumatized. He stated that there is no guarantee that this will not happen again if "Z" Code status is not reinstated. ([ECF No. 52-4 at 36-37](#).) He also attached a copy of a newspaper article

5

where an inmate at SCI-Fayette was awarded $50,001 by a federal jury on a failure to protect claim. ([ECF No. 52-4 at 41](#).)

On April 3, 2012, Captain Workman and Defendant Johnson, Plaintiff's Unit Manager at SCI-Fayette, conducted an interview with Plaintiff. Plaintiff stated that his primary concern was to regain his "Z" Code status. ([ECF No. 52-4 at 44](#).) Johnson explained in detail that the Superintendent could not grant him a "Z" Code, but that the Unit Team would revisit the subject again in conjunction with the Psychology Department. Plaintiff was informed that if he did not qualify, he could request a particular cellmate with whom he felt compatible. Plaintiff was asked if he felt his safety was in jeopardy and if he wanted to be placed on administrative custody status. Plaintiff stated that he was fine and that he would try to remain misconduct-free. ([ECF No. 52-4 at 44](#).) Defendant Duncan again met with Plaintiff on April 5, 2012 to determine his appropriateness for "Z" Code. ([ECF No. 52-6 at 15-16](#).) Defendant Duncan again noted that he was inactive on the DOC's Mental Health Roster and in the absence of mental health criteria, psychiatry or psychology had no direct input on decisions pertaining to his celling status. ([ECF No. 52-6 at 15-16](#).) Duncan did note that Plaintiff indicated his intention to hold DOC accountable for his safety. ([ECF No. 52-6 at 15](#).)

On April 10, 2012, Plaintiff submitted an "Inmate's Request to Staff Member" form directed to Superintendent Coleman, inquiring again about "Z" Code. Plaintiff received a response from Captain Workman on the Superintendent's behalf indicating that he was looking into his "Z" Code concerns and would advise him regarding the same. ([ECF No. 52-4 at 46](#).)

C. **Plaintiff "Comes Out" as a Homosexual**

Plaintiff filed Grievance No. 420518 dated July 17, 2012 indicating that he spoke with Defendant Husarchik, the Psychological Services Specialist. ([ECF No. 52-4 at 51](#).) Plaintiff reported that he expressed to Husarchik that he was a homosexual and wanted to engage in an openly alternative lifestyle. He further reported that she cautioned him of the consequences of engaging in sexual conduct in the prison. Plaintiff also reported that he spoke to Defendant Neligh, a corrections officer, who became aware of Plaintiff's homosexuality, about moving out of his cell because his cellmate was "having trouble" being Plaintiff's cellmate. Plaintiff wanted to be housed with someone of the "same sexual orientation." ([ECF No. 52-4 at 51](#).) Defendant Johnson drafted the Initial Review Response indicating that, according to DOC rules and regulations, sexual acts of any kind are prohibited in the institution. ([ECF No. 52-4 at 52](#).) Plaintiff noted that he continues to be moved out of cells with other inmates "because they refuse to accept my alternative lifestyle." ([ECF No. 52-4 at 55](#).) Plaintiff continued that he spoke with Defendants Voytko, Ankrom, Husarchik, Neligh, Johnson, and Coleman, among others, and "feel[s] that my issue of my sexuality is not being taken serious[ly] enough . . . ." ([ECF No. 52-4 at 55](#).) He also indicated that the two indecent exposure misconducts were evidence of his alternative lifestyle and "what more do I need to show you[?]" ([ECF No. 52-4 at 55](#).) In the "Facility Manager's Appeal Response," Defendant Coleman reiterated that engaging in sexual acts with others, sodomy, and indecent exposure are Class I misconducts. In response to Plaintiff's inquiry as to why he was placed in administrative custody, Coleman explained that one of the sanctions for these misconducts is disciplinary custody time, and that cell changes would be considered if the request is appropriate. Further, Defendant Coleman emphasized that Plaintiff was housed according to policy. ([ECF No. 52-4 at 56](#).)

Plaintiff submitted an "Inmate's Request to Staff Member" dated August 1, 2012 to Defendant Voytko, a Psychological Services Specialist. (ECF No. 52-4 at 62.) Therein, Plaintiff discussed that he had not heard from his Unit Manager, Defendant Johnson, about his request to cell with a particular inmate. Plaintiff stated that his continuous moving around because of his sexuality is a form of psychological harassment. According to Plaintiff, his "only goal is to have oral and/or anal intercourse with another man." (*Id*.) Defendant Voytko responded that Defendant Johnson will be addressing the issue. (*Id*.) Thereafter, Plaintiff was placed in administrative custody for the reason that he was a danger to himself or others. (ECF No. 52-4 at 64.)

On August 24, 2012, Plaintiff submitted an "Inmate's Request to Staff Member" directed to Defendant Superintendent Coleman. (ECF No. 52-5 at 2.) Plaintiff indicated that he was trying to make sense of the fact that the DOC is claiming he is a danger to himself or others, and yet they housed him with a cellmate in the RHU. Plaintiff suggested a transfer if he is a danger because of his alternative lifestyle. Superintendent Coleman responded: "No transfer for you. PRC/Security/Line Staff believe you are attempting to manipulate in order to obtain "Z" Code. You are appropriately house on A/C status in the RHU . . . ." (ECF No. 52-5 at 2.)

Then, on August 27, 2012, Plaintiff wrote to Defendant Wetzel, Secretary of Corrections, asking for help regarding his cell status in light of his alternative lifestyle. (ECF No. 52-4 at 57.) Plaintiff cited DOC policy that includes homosexuality as a consideration for "Z" Code, and informed Defendant Wetzel that prison personnel have failed to follow this policy. In conclusion, Plaintiff stressed that if he is assaulted physically or sexually, all are aware of his sexuality, and Plaintiff will hold the DOC liable for being deliberately indifferent to his sexual orientation. (ECF No. 52-4 at 57.)

Plaintiff attended a Program Review Committee ("PRC") meeting on August 30, 2012. The PRC released Plaintiff "to General Population, pending available bed space." ([ECF No. 52-4 at 68](#).)

### D. **Plaintiff and Copeland Agree to be Cellmates**

On September 25, 2012, Plaintiff "told security that he does not have a problem with taking a cellmate. He was instructed to let his unit team know when he found someone that he was compatible with and they would review moving them [in] together." ([ECF No. 52-1 at 46](#).) The following day Defendant Johnson advised that Inmate Copeland "was brought over to B-block to cell with [Plaintiff]." ([ECF No. 52-1 at 46](#).) Plaintiff and Copeland verbally agreed to become cellmates; however, a written cell agreement was not executed. (ECF Nos. 52-6 at 36 & 41.)

During the next month, and up to the time of the October 31, 2012 incident, Defendants maintain that Plaintiff did not report any problems with his new cellmate to his unit team or other staff on B-Block. On October 27, 2012, Plaintiff was in Defendant Johnson's office requesting to be placed into school. Unit Manger Johnson contacted the appropriate persons and Plaintiff was placed on the school list that day. Plaintiff expressed no concerns to Defendant Johnson at this time about his safety. Defendant Johnson, however, specifically inquired with Plaintiff as to whether he was "getting alone with his cellmate," and Plaintiff responded that "it is what it is." ([ECF No. 52-1 at 58](#).) Plaintiff did not express that he was being threatened, or that he wanted to be moved out of his current cell. (*Id*.)

On October 29, 2012, Plaintiff drafted Grievance No. 434174, which was received by the Facility Grievance Coordinator on October 30, 2012. Plaintiff wrote that on October 28, 2012,

9

he was assaulted by his cellmate until he blacked out. He stated that he reported the event to Defendant CO Neligh, who indicated that he would inform Unit Manager Johnson. Plaintiff continued that with this information, Defendant Neligh did not separate the cellmates, even though it was his duty to do so while Plaintiff was in the care and custody of the DOC. (ECF No. 52-56 at 11.) Plaintiff noted the following: "This is the second incident when a cellmate has attack[ed] me while being double cell[ed]. The institution has continue[d] to be deliberate[ly] indiff[e]rent to my safety, sexuality and DC-ADM 11.2.1 policy . . . ." Plaintiff requested $50,000 for "failure to protect." (*Id.*) An Initial Review Response indicated that Plaintiff never reported any issues to Unit Manager Johnson or CO Neligh regarding his cellmate. Plaintiff appealed and the grievance was remanded for further investigation. ([ECF No. 52-5 at 13-14](ECF No. 52-5 at 13-14).) Captain Frank Tempus, the Intelligence Captain at SCI-Fayette, provided the Initial Review Response to Grievance No. 434174 dated January 16, 2013. Captain Tempus responded as follows:

> After reviewing the claims in your grievance the following was noted. You were placed in the cell on B unit B pod 1002 with Inmate Copeland GH8524 for approximately 30 days. During this time there was no indication made to Unit Manager Johnson or Sgt. Neligh that you were assaulted on 10/28/2012. There was likewise no indication from any of the other staff assigned to B Unit that you were assaulted. It should be noted there are phone numbers posted on all of the housing units for inmates to use to report physical and or sexual abuse. Additionally Unit Manager Johnson and Sgt. Neligh are not the only staff members that works [sic] on that unit. You could and should have reported this alleged incident to any other staff member that works on the unit. You also could have reported this alleged incident to any of the staff members who you may have come into contact with. You chose to do neither. Appropriate evaluations were made on you and your cellmate. These evaluations indicate there was no correctional justifiable reason why the two of you could not have shared a cell together. There is no cover up as you claim in the grievance. There is likewise no issue where the staff at SCI Fayette failed to protect you. For this reason the grievance is denied.

([ECF No. 52-5 at 15](#).)  Plaintiff pursued appeals through all levels; however, the Initial Review Response issued by Captain Tempus was sustained.  ([ECF No. 52-5 at 16-20](#).)

### E. **Plaintiff and Copeland's Communications to Persons outside the Institution Immediately before and after the Assault**

Less than a month after the October 31, 2012 assault, Plaintiff wrote a letter to an individual named Michael Armstrong, which provides in relevant part as follows:

> Listen!  I just got your missive.  I'm glad you wrote, however, I'm disappointed regarding the topic.  My blood I've been doing this a long time.  I'm coming up on 11 years strong.  And I cross path with a lot of niggas and a lot of situation and the best they can do to my name is call me a "<u>faggot</u>."  Listen bro I never been a weak nigga and/or a gossiping type of nigga.  And I travel jail to jail putting in work and ready to go at whoever.  This is what I'm trying to tell you about niggas these days niggas always want to bring a good nigga down. . . . And up here I had a "Z" Code and they took it *so I go nake on a nigga twice in hope of getting my "Z" Code back* because had I bang something out they was gonna give me a new case.  Now Zeek is up here and Malik is up here *them niggas wouldn't be fucking with me had there been any fact to them rumors.  Now me and my celly just pulled a stunt*.  I'm surprise niggas ain't write and say I ratted.  Listen to this a lie will get half way around the world before the truth will get it's pants on.  Listen I love pussy and this lotion has always come through for me like some pussy. . . . *That gay shit aint never gonna be my style*.

([ECF No. 52-1 at 68-69](#)) (emphasis added by Court) (underline in original).

Similarly, an investigation of the October 31, 2012 assault revealed two (2) telephone calls made by Copeland to a woman named Darlene Pacecraft.  ([ECF No. 52-2 at 36](#).)  The first call was placed on October 22, 2012 at 3:03 p.m.  Copeland indicated that once "this" happens, he will "get 90 days to 6 months in the hole."  Later he said it would not be worth it for her "to come here for a 1 hour visit."  ([ECF No. 52-2 at 36](#); [ECF No. 52-1 at 4](#).)  The second call was

placed on October 30, 2012 at 8:11 p.m. Copeland stated that he would not be able to speak with her for a while and the listener indicated that she understood. She asked if he needed money or if he would "still get commissary." He told her yes but that "it is a little different." ([ECF No. 52-2 at 36](ECF No. 52-2 at 36); [ECF No. 52-1 at 4](ECF No. 52-1 at 4).) A written report of the investigation, dated February 20, 2013, was generated by Intelligence Captain Joseph F. Trempus and included 23 attachments. ([ECF No. 52-1 at 2-80](ECF No. 52-1 at 2-80); [ECF No. 52-2 at 1-84](ECF No. 52-2 at 1-84).) The investigative report concluded as follows:

> The evidence is clear, Inmate Armstrong has attempted to use any means at his disposal to secure single cell status when he obviously does not warrant such placement. The various documents provided in this investigation show the different ways Inmate Armstrong has attempted to manipulate the system to suit his agenda.
>
> The most compelling pieces of evidence are the phone calls made by Inmate Copeland just prior to the incident on 10/31/12 and the letter authored by Inmate Armstrong just after the incident where he writes that me and my celly pulled a stunt.
>
> Based on the investigation conducted by the staff from the Security Office at SCI Fayette, there is no evidence that supports the allegation made by Inmate Armstrong that he was not protected and that he was not appropriately housed.

([ECF No. 52-1 at 5](ECF No. 52-1 at 5).)


II. LEGAL STANDARDS

    A. SUMMARY JUDGMENT

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." [Fed. R. Civ. P. 56(a)](Fed. R. Civ. P. 56(a)). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any

12

element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non-movant's burden of proof. *Id.* Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty-Lobby, Inc.*, 477 U.S. 242, 248 (1986). In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249-50 (internal citations omitted).

### B. PRO SE PLEADINGS

The Court must liberally construe the factual allegations of Plaintiff's Complaint because pro se pleadings, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). That is, the court should "'apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name.'" *Higgins v. Beyer*, 293 F.3d

13

683, 688 (3d Cir. 2002) (quoting *Holley v. Dep't of Veterans Affairs*, 165 F.3d 244, 247-48 (3d Cir. 1999)).  Finally, Federal Rule of Civil Procedure 8(e) requires that all pleadings be construed "so as to do justice."  Fed. R. Civ. P. 8(e).

III.    ANALYSIS

        Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  To state a claim for relief under this provision, a plaintiff must demonstrate that the conduct in the complaint was committed by a person or entity acting under color of state law and that such conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or the laws of the United States.  *Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250, 1255-56 (3d Cir. 1994).  Section 1983 does not create rights; it simply provides a remedy for violations of those rights created by the United States Constitution or federal law.  *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

    This Court has summarized the Eighth Amendment legal standard pertaining to failure to protect in *Jones v. Day,* No. Civ. A. 03-1585, 2007 WL 30195 (W.D. Pa. Jan. 4, 2007), as follows:

> The Eighth Amendment's prohibition against the infliction of cruel and unusual punishment has been interpreted to impose upon prison officials a duty to take reasonable measures "'to protect prisoners from violence at the hands of other prisoners.'" [Hamilton v. Leavy,] 117 F.3d 742, 746 (3d Cir. 1997) (quoting

*Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). Although, "[i]t is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for a victim's safety," "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 345 (1981)). A plaintiff must prove more than that he had a fight with another inmate, *see Beard v. Lockhart*, 716 F.2d 544, 545 (8th Cir. 1983), and mere negligent conduct that leads to serious injury of a prisoner by a prisoner does not expose a prison official to liability under § 1983. *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986). To succeed, a prisoner must show that: (1) he was incarcerated under conditions posing a substantial risk of serious harm; (2) the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (3) the defendant actually drew this inference; and (4) the defendant deliberately disregarded the apparent risk. *Farmer*, 511 U.S. at 834-37.

      In determining whether a defendant was deliberately indifferent, the court must "focus [on] what a defendant's mental attitude actually was (or is), rather than what it should have been (or should be). *Hamilton v. Leavy*, 117 F.3d at 747. It is not an objective test for deliberate indifference; rather, *the court must look to what the prison official actually knew, rather than what a reasonable official in his position should have known.* "A prison official's knowledge of a substantial risk is a question of fact and can, of course, be proved by circumstantial evidence." *Id.* In other words, it may be concluded that a prison official knew of a substantial risk from the very fact that the risk was obvious.

. . .

      Thus, in order to survive defendants' summary judgment motion, a plaintiff is obligated to produce sufficient evidence to support the inference that defendants "'knowingly and unreasonably disregarded an objectively intolerable risk of harm.'" *Beers-Capitol v. Whetzel*, 256 F.3d 120, 132 (3d Cir. 2001). It is not enough to assert that a defendant should have recognized the risk; the evidence must be sufficient to support the inference that "the defendant must have recognized the excessive risk and ignored it." *Id*. at 138.

*Jones*, 2007 WL 30195, at *3-4 (emphasis added).

Here, Defendants argue that they are entitled to summary judgment because in addition to having no knowledge that Copeland was a threat to Plaintiff, the record is replete with evidence that Plaintiff and Copeland staged the attack in an attempt to regain single cell ("Z" Code) status. Plaintiff responds that he has come forward with evidence to raise a genuine issue of fact that Defendants failed to protect him from known dangers.

A thorough review of the entire summary judgment record reveals that no reasonable jury could return a verdict for the Plaintiff. Instead, evidence of record overwhelmingly establishes that Defendants were unaware of any particular threat or harm posed by Copeland, and that the attack by Copeland was staged.

Plaintiff directs the Court to several documents, which according to Plaintiff, demonstrate that Defendants deliberately ignored known threats and dangers to Plaintiff's safety. First, Plaintiff argues that Copeland's misconduct dated May 8, 2012 demonstrates that Copeland posed a threat to any potential cellmate. ([ECF No. 55 at 3](#).) The misconduct notes in relevant part as follows:

> On the above date [May 8, 2012] and time[,] inmate Copeland [] was being reviewed by PRC on J-Block. Inmate Copeland was informed that he had no Z-code by PRC and was cleared to be released to general population. Inmate Copeland stated that he was Z-coded and PRC members verified that the Z-code did not exist and that it had been removed. Inmate Copeland then stated to PRC, "If you put me out in pop.[general population] I ain't taking no cellie and if I get one I will kill him."

([ECF No. 55-1 at 2](#).) Because Copeland and Plaintiff verbally agreed to be cellmates in late September 2012, no reasonable jury could conclude that Defendants were deliberately indifferent to a known threat or danger to Plaintiff posed by Copeland. The May 8, 2012 Misconduct actually suggests that Copeland and Plaintiff shared the same motive in staging the October 31, 2012 attack—a return to "Z" Code status.

16

Next, Plaintiff comes forward with two documents that relate to his attack at SCI-Greene on March 1, 2004. (ECF No. 55-1 at 4-6.) Plaintiff contends that these documents demonstrate that he was afraid for his safety after being victimized eight (8) years ago and that he needed his "Z" Code status reinstated. He indicated that he has carried "Z" Code status through four (4) different DOC institutions and maintained that he still required it. (ECF No. 55-1 at 5-6.) These documents do not reflect, however, that Defendants knew of a particular danger or threat to Plaintiff's safety.

Plaintiff also points to a series of documents that according to Plaintiff, demonstrate that Defendants were aware that he feared for his safety and wished to remain on "Z" Code status. These documents relate to Plaintiff's numerous representations to DOC staff and administration, including his two misconducts for indecent exposure, that he is a homosexual and should be single celled pursuant to DOC policy. (ECF No. 55 at 3-5; ECF No. 55-1 at 9-10; 15-24; 26-32; ECF No. 56-1 at 4.) These documents do not reflect any particular threat to Plaintiff. Plaintiff simply insisted that he should be single celled pursuant to DOC policy. As noted above, DOC Policy 11.2.1 provides that homosexuality is one criterion considered for single cell status: "Any inmate who meets any of the following criteria shall be *carefully reviewed by staff and considered* for Program Code "Z" housing classification." (ECF No. 52-3 at 21-22) (footnotes omitted) (emphasis added). The language of the policy is clear that homosexuality will trigger *consideration* for single cell status; single cell status is not mandated by the policy. Documents of record, discussed *supra* at I.B., reflect that Defendants repeatedly attempted to address Plaintiff's concerns about his cell assignment in light of his homosexuality until eventually, he and Copeland agreed to share a cell.

Next, Plaintiff comes forward with four (4) documents dated in the month of October, 2012. ([ECF No. 55-1 at 33](#); [ECF No. 56-1 at 2-3](#), 5.) Three documents dated October 3, 2012, October 8, 2012, and October 29, 2012, are forms entitled "Inmate's Request to Staff Member." There are many completed forms of this type in the record. In these three (3) forms directed to Defendant Unit Manager Johnson, Plaintiff complained that Copeland threatened him, and at one point, attacked him. Plaintiff further indicated in all three documents that he verbally complained to Defendant CO Neligh who indicated that he would report the issue to Defendant Johnson but that nothing had been done to assist Plaintiff. These October forms do not contain either date stamps or responsive comments from staff. Every other "Inmate's Request to Staff Member" form in the record contains a date stamp, and many contain responsive comments from staff. Consequently, it is unclear whether Plaintiff actually submitted these forms to DOC personnel. The final document is also dated October 29, 2012 and is an official grievance reporting the same incident described in the October 29, 2012 "Inmate's Request to Staff Member." Official Inmate Grievance No. 434174 reports that on October 28, 2012, Copeland punched and choked Plaintiff until he blacked out, that Plaintiff reported the incident to Defendant Neligh who indicated he would inform Defendant Johnson, and that Defendant Neligh failed to separate Plaintiff and Copeland "after having this knowledge which is his duty while in the care, custody or control of D.O.C." ([ECF No. 56-1 at 5](#).) Plaintiff also noted that "the institution has continue[d] to be deliberate[ly] indifferent to my safety, sexuality and DC-ADM 11.2.1 policy . . . ." ([ECF No. 56-1 at 5](#).) This final document is date stamped October 30, 2012. Plaintiff concludes that with this information, Defendants had the duty to protect him from the attack by Copeland that occurred in the early morning hours of October 31, 2012. Yet, the investigation undertaken by the Intelligence Captain at SCI-Fayette found that up until the

18

October 30, 2012 date stamped grievance submitted literally hours prior to the alleged attack, Plaintiff never complained to any DOC personnel about Copeland.

Importantly, the Court notes that Plaintiff has come forward with no evidence to raise a genuine issue of material fact that Copeland's attack on Plaintiff was not staged. He does not attempt to explain the contents of his letter to Michael Armstrong, quoted in detail, *supra* at I.E., and written less than one month after the October 31, 2012 assault. As emphasized by the United States Supreme Court in *Scott v. Harris,* "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." 550 U.S. 372, 380 (2007). Plaintiff makes several statements in that letter that directly contradict numerous statements he made to DOC personnel in the months preceding the October incident. First, Plaintiff is emphatic that he is not a homosexual. He references his two misconducts for indecent exposure (which Plaintiff cited to DOC personnel as evidence of his homosexuality) as attempts to regain his "Z" Code status. Almost immediately thereafter, Plaintiff unequivocally states that "me and my celly just pulled a stunt," suggesting that Copeland and Plaintiff had planned the incident. Relatedly, the transcripts of two (2) telephone calls made by Copeland to Darlene Pacecraft, one placed a week before the assault and the other less than one day before, contemplate an event that will result in disciplinary measures against Copeland. Confronted with this record evidence that so utterly discredits Plaintiff's version of events, no reasonable jury could find in favor of the Plaintiff.

IV. CONCLUSION

For the reasons discussed above, the Motion for Summary Judgment (ECF No. 49) will be granted.

An appropriate Order will follow.

Dated: May 22, 2015

BY THE COURT

s/Lisa Pupo Lenihan
LISA PUPO LENIHAN
UNITED STATES MAGISTRATE JUDGE

cc: Kareem Armstrong
FC-1437
SCI Smithfield
1120 Pike Street
Huntingdon, PA 16652

All counsel of record
Via electronic filing